## THE CALVIN AUSTIN.

### THE HELEN B. MORAN.

(District Court, E. D. New York. July 15, 1921.)

**Collision ⟐⟐95(4)—Steamer and tow meeting in Hell Gate.**
  A steamer passing down through Hell Gate, which was swung so far northward by the strong flood tide that she was unable to round the south side of Man O'War Rock as intended, and in maneuvering to regain her position got in the way of a meeting tug and tow, *held* in fault for a collision with one of the barges of the tow.

In Admiralty. Suit for collision by Cleary Brothers, a corporation, against the steamship Calvin Austin and the tug Helen B. Moran. Decree for libelant against the Austin, and libel dismissed as to the Moran.

Thomas Cooper Byrnes, of New York City, for libelant.
Haight, Sandford, Smith & Griffin, of New York City, for the Calvin Austin.
Park & Mattison, of New York City, for the Helen B. Moran.

CHATFIELD, District Judge. On the 28th day of June, 1919, passage through Hell Gate was restricted by a dredge and a drill working on the Long Island side of the channel across from and to the south of Negro Point. At about 8:30 a. m. the steamer Calvin Austin, which has a length of 298 feet and is used upon the route between Boston and New York, was coming through the Sound bound for New York. When reaching the turn at Pott Cove, she headed toward Man O'War Rock, with the intention of passing it on the southerly or Long Island

⟐⟐For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

side. The tide had been running flood for about an hour and was par-ticularly strong that morning. Flood tide, as it passes up the East River, divides at Man O'War Rock, one part running into the Harlem River for some distance until it meets the tide from the Hudson, while the greater body of water goes on through Hell Gate to the Sound. A part of the stream running into the Harlem sweeps around to the north of Man O'War Rock and joins the stream running to the Sound, thus causing an eddy close to Man O'War Rock along its northeastern shore.

When the Austin attempted, under a hard astarboard helm, to make the turn to the south at Man O'War Rock, the strong tide, running more than 5½ miles an hour and striking the port bow of the steamer at this turn, carried the bow towards Ward's Island, compelling the steamer to go to the northeastward of Man O'War Rock in order to avoid striking the rock. As the bow of the steamer reached the eddy behind the rock, her stern swung over towards Ward's Island, until the steamer was in such a position that she could not proceed ahead around Man O'War Rock into the Harlem River, so as to pass down through the westward channel.

It appears from the testimony that the Austin could with safety have navigated the channel to the north and west of Man O'War Rock, if her captain had undertaken the passage in time, but after she reached the position where her bow was forced in close to the rock, it was impossible for her to obtain steerageway and to get away from the rock without stopping, backing, and withdrawing into either one channel or the other. By careful maneuvering, both backing and going ahead upon her engines, she reached a position where she could draw back away from the upper end of the rock, and then passed within a distance estimated as 50 feet from the corner of the rock, down through Hell Gate in the direction of her original course. In the meantime a tow, in charge of the tug Helen B. Moran, was coming out through Hell Gate, and, when off the upper end of Blackwell's Island, near Eighty-Sixth street, or opposite Horn's Hook, observed the Austin passing across and apparently proceeding through the channel to the west of Man O'War Rock. The tow of the Moran consisted of the Weiant upon her port hawser, the St. Cyr upon her starboard hawser, and the Hastings No. 2 behind the St. Cyr in the second tier. The scows were loaded with rubbish, and were upon a hawser estimated at 150 feet in length.

The Austin gave no signal to the Moran before coming out from behind Man O'War Rock. The mate of the Austin saw the Moran tow after passing the dredge and drill. The captain of the Austin did not see the Moran nor her tow, but was paying undivided attention to the navigation of his own vessel until after the Austin had resumed her course to pass Man O'War Rock upon the south side.

It is the custom for a Sound steamer, passing down through the Hook against the flood tide, not only to blow a long whistle before entering the Gate, but also to wait in the neighborhood of Pott Cove, or further back toward the Sound, if a tow is met directly in the Gate. It is also the custom for a tug passing up around Negro Point to haul over toward Negro Point, in order to keep its tows away from the steep

or scaly rocks on the Long Island side of the river at that point. Thus the Sound steamers lie back far enough to pass the tows port to port to the eastward of Negro Point, pass them starboard to starboard by proceeding into Pott Cove, or pass port to port between Negro Point and Man O'War Rock. It is the custom, also, for the tows, after leaving Horn's Hook, to haul over to the port side of the channel and within some 300 or 400 feet of Man O'War Rock; in other words, to follow the stream of the tide past Man O'War Rock until the corner is reached, where the turn of the tide itself takes them straight down past Hog's Back and Negro Point.

The presence of the dredge and drill made it much more difficult for a steamer to run in toward Pott Cove or under the shore of Hallets Point, and thus to pass a boat starboard to starboard in the fashion indicated. But on the occasion in question no such maneuver was necessary, for the Austin would plainly, if she had obeyed her helm and proceeded at regular speed upon her course, pass well below Man O'War Rock before meeting the Moran and her tow. It was not negligence, therefore, for the Austin to fail to blow a whistle to the Moran before running behind Man O'War Rock. The long whistle, to indicate that the Austin was coming through the Gate, had been blown some time previous to reaching the point in question. The Moran also had blown a whistle when off Horn's Hook, which was not noticed by the Austin, but which would have had no bearing upon the Austin's movements under the circumstances.

The Austin apparently reached a point where she was approximately parallel to the general longitudinal dimension of Man O'War Rock, and where her bow was some 250 or 300 feet away from the western or lower extremity of the rock, while her stern reached up to the broader or central portion of the rock and was some 75 feet out in the river therefrom. Her officers had been so apprehensive of striking Man O'War Rock, when so close to its dangerous shore, up to this point, that they had been proceeding at slow speed, barely holding their own against the tide, and moving at a rate of not more than 6 miles through the water. They thus had mere steerageway, but with little possibility of changing the position of their vessel unless the speed was quickly increased.

Under these circumstances the captain of the Austin observed the Moran and her tow, which had approached until it was nearly opposite Man O'War Rock and on a course some 300 feet out from its western or lower end. It appears from the testimony that the Moran could not approach closer to Man O'War Rock without putting the tow in a position where it might be carried by the tide into the Harlem River, yet the captain of the Moran was compelled to get as far as was safe over toward Man O'War Rock, in order to have plenty of room to avoid the dredge and the drill after turning the corner.

As the Moran and the Austin saw each other in these respective positions, each blew a one-whistle signal, followed by alarm whistles on the part of the Moran. The captain of the Austin testifies that the alarm whistles preceded the one-whistle signal, but this is evidently a mistake. The Moran pulled over slightly under a port helm, in or-

der to hold her tows from swinging against the Austin; but, as the boats were passing each other, the Moran reached a point where the set of the tide rapidly swung her scows closer to the Austin, with the result that the port side of the Austin, about 60 feet from her stem, came in contact with the port side of the Weiant, about 20 feet from the after corner. The Weiant was forced by the blow away from the side of the Austin, which passed on as the scows continued their course, and struck also the Hastings No. 2, which had swung further around toward the Austin through the breaking of the starboard line from the St. Cyr. Considerable damage was done to the Hastings No. 2, which was owned by the libelant in this action, and for which damage this suit has been brought.

As has been previously stated, no negligence can be predicated upon the signals (or lack of signals) of the Austin or of the Moran prior to the time when the Austin came out from behind Man O'War Rock. It evidently would have been better navigation if the Austin had attempted (immediately after passing the dredge and drill) to have worked over toward Hallets Point under a starboard helm, and thus to have avoided the force of the tide, which made her unmanageable and forced her toward Man O'War Rock. But at that time there was no danger apparent from the Moran or her tow, and it cannot be held to have been negligent navigation, with respect to the Moran, for the captain of the Austin to have failed to anticipate that his subsequent difficulties might put him in a position where danger would arise. It is impossible to determine why the Austin did not answer her helm. Perhaps her way slackened, or an unexpected swing of the tide may have put her out of control; but at that time the Moran was not in such a position as to make it imperative for the Austin to initiate a course by which the Moran would pass starboard to starboard, nor was it negligence for the Austin to continue with the idea of passing her port to port. Nor is there any evidence in the case that negligence upon the part of either boat can be predicated upon their whistles.

As has been said, the Moran was not at fault for failing to understand that the Austin was in difficulty, or that this large and powerful steamer was going to put herself in such a position that she could not pass through to the north and westward of Man O'War Rock, where the captain of the Moran knew there was plenty of water for her to proceed. When the Austin backed out from behind Man O'War Rock and again turned downstream, the Moran could not change the course of her tow further toward Long Island without danger of bringing up against the dredge and drill, nor could she change her course so as to go into the Harlem River without danger of striking Man O'War Rock.

It is evident that the Austin was at all times visible to the Moran, and that the Moran was at all times visible to the Austin. The first obvious act of negligence, therefore, was in the failure of the Austin and her lookouts to take into account the approach of the Moran and to bear her in mind while maneuvering to get out from behind Man O'War Rock. A vessel with the power of the Austin should have been able to have dropped back from the side of Man O'War Rock

and to have directed her course through the westward channel, and thus to have kept out of the way of the Moran, if the presence of the Moran and her boats had been taken into account by the master or pilot of the Austin at the time when the Austin once more was gotten under control and before she proceeded along the south side of Man O'War Rock toward the Moran and her tow. Further, according to the testimony, the water is deep enough on the south side of Man O'War Rock and toward its western end so that if the Austin had increased her speed and attempted to throw her bow closer to the narrow part of Man O'War Rock, it would appear that she could have avoided the swing of the Moran's scows and the accident would have been prevented.

The captain of the Austin was justified in his desire to keep away from the vicinity of Man O'War Rock, but if he deliberately preferred to run down the Moran's scows in order to avoid possible danger from the Rock, then, having made the choice, the Austin is responsible for the damage inflicted in furthering the safety of the large vessel. On the other hand, if the captain of the Austin, who was acting as his own pilot, had been thoroughly acquainted with the depth of water along the side of the Man O'War Rock, he could apparently with safety have given way somewhat and avoided the collision.

In these conclusions the court has been taking the position of the Austin to be that fixed by her own captain and as indicated by models in court at the time of the trial. If the position be that fixed by the captain of the Moran, and to some extent substantiated by the mate of the Austin, then the bow of the Austin was so far over toward Long Island, and on a course away from Man O'War Rock, that the failure of the Austin to take notice of the presence of the Moran must be held to have been negligence. The Austin could not have swung around so far toward the Long Island shore, and put herself so nearly upon a course where she could, if necessary, have gone back through the Gate, in order to avoid the Moran, without being held responsible for getting in the way of the Moran and her tow.

It would appear, however, from the testimony of all the witnesses, that the extreme care used by the captain of the Austin in proceeding slowly because of his proximity to Man O'War Rock left him without sufficient control over the movements of his vessel to enable him to clear the Moran's tows, even though he had sufficient room within which to change his course the slight amount necessary to escape collision.

The libelant may have a decree against the Austin, and the libel against the Moran will be dismissed.